*Maryland Department of Health v. Jeffrey Boulden, et al.,* Nos. 534, 581, 582, 641, 643, 996 & 1291, September Term, 2024.  Opinion by Graeff, J.

**CONSTRUCTIVE CIVIL CONTEMPT — STATUTORY SANCTIONS**

Where the court finds an individual to be incompetent to stand trial ("IST") and dangerous, the Maryland Department of Health (the "Department") is required, under Md. Code Ann., Criminal Procedure ("CP") § 3-106(c)(4) (2024 Supp.), to admit the defendant to a designated health facility within ten business days of the commitment order.  If the Department does not admit the defendant to a Department facility within that time period, the defendant can seek to compel compliance by filing an action for constructive civil contempt or an action for statutory sanctions under CP § 3-106(c)(4).

Constructive civil contempt requires a finding, based on evidence, of a willful failure to comply with the court's commitment order.  In the Dorchester County case, the only evidence presented in support of the contempt petition was that the Department had taken action to alleviate the bed shortage in its facilities, but there were still not enough beds to comply with the court's commitment order.  Without evidence that the Department could have done more to comply with the order, the mens rea element of constructive civil contempt, i.e., willfulness, is not satisfied.  Because the record does not support the finding that the Department willfully failed to comply with the Dorchester County commitment order, the court's finding in this regard was clearly erroneous, and it abused its discretion in holding the Department in contempt.

In addition to a contempt finding, a court can impose sanctions on the Department pursuant to CP § 3-106.  To find a violation of CP § 3-106(c)(2), the court needs to determine only that the Department failed to admit the defendant to a designated health facility within the statutorily required ten-day period.  Evidence that the Department could not comply with commitment orders due to the unavailability of beds does not categorically preclude sanctions under CP § 3-106(c)(4).  If the court finds a failure to timely admit a defendant, the statute provides for the imposition of sanctions "reasonably designed to compel compliance."

Although the statute does not define the term "reasonably designed to compel compliance," the legislative history makes clear that the intent of the General Assembly in enacting CP § 3-106(c)(4) was to impose a deadline for admission, with sanctions to enforce compliance.  Given the increasing problem of a failure to timely admit defendants, it was reasonable for the courts to believe that large statutory sanctions would encourage the Department to explore all options to resolve this continued problem.

That two of the defendants, Glenn D. Hawkins and Kennard Jacobi Goins, had been admitted to a Department facility prior to the sanctions hearing did not prohibit the court from imposing sanctions under CP § 3-106(c)(4).  The statute does not contain any

language stating that reimbursement or other sanctions cannot be imposed once the patient has been admitted to a Department facility. Construing the statute to limit sanctions, including reimbursement to detention centers, when the Department has already admitted a defendant to a facility prior to the sanctions hearing would add words to the statute and frustrate the legislature's express intent to allow for reimbursement to the detention center for costs incurred in housing defendants that should be in a Department facility.

In the Kent County case involving Jeffrey Boulden, and in the Baltimore County cases involving William Damond Lomax, Malik T. Jackson, Mr. Goins, Mr. Hawkins, and Steven R. Kauffman, the court did not abuse its discretion in its decision to impose sanctions. With respect to the amount of sanctions, however, we construe the statute to authorize the calculation of daily sanctions beginning on the 11th business day from the date of the commitment order. In the Baltimore County cases involving Mr. Lomax, Mr. Jackson, Mr. Goins, and Mr. Hawkins, the court did not calculate the daily sanctions beginning on the 11th business day. We reverse those orders and remand for a new calculation regarding the amount of sanctions.

Circuit Court for Kent County
Case Nos. C-14-CR-21-000044, C-14-CR-23-000050, C-14- CR-23-000146

Circuit Court for Baltimore County
Case Nos. C-03-CR-24-000015, C-03-CR-24-000251
C-03-CR-23-002969, C-03-CR-23-003449
C-03-CR-23-003775

Circuit Court for Dorchester County
Case No. C-09-CR-23-000286

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

Nos. 534, 581, 582, 641, 643, 996, 1291
September Term, 2024

_____

MARYLAND DEPARTMENT OF HEALTH

v.

JEFFREY BOULDEN, ET AL.

_____

Graeff,
Leahy,
Kehoe, Christopher, B.
      (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed:  June 3, 2025

We are called upon, once again, to address the propriety of sanctions against the Maryland Department of Health (the "Department") for its failure to comply with court orders and a statutory mandate to admit individuals, who have been accused of committing a crime and been found incompetent to stand trial ("IST") and dangerous due to a mental disorder, to a Department mental health facility within ten business days after the commitment order. This is a recurring, vexatious problem that the Maryland appellate courts have addressed in multiple cases over many years. *See Powell v. Md. Dep't of Health*, 455 Md. 520 (2017); *State v. Crawford*, 239 Md. App. 84 (2018); *Md. Dep't of Health v. Myers*, 260 Md. App. 565, *cert. denied sub nom. Sanders v. Md. Dep't of Health*, 487 Md. 267 (2024).

In this consolidated appeal, the Department, appellant, challenges seven separate orders that were issued due to its failure to timely admit appellees, who had been found IST and dangerous, to a psychiatric facility. Six of these orders involved the imposition of statutory sanctions pursuant to Md. Code Ann., Crim. Proc. ("CP") § 3-106(c)(4) (2024 Supp.), one issued by the Circuit Court for Kent County and five issued by the Circuit Court for Baltimore County. One order, issued by the Circuit Court for Dorchester County, found the Department in constructive civil contempt for the failure to comply with a court order to admit Jermell Lamar Savage, appellee, to a Department facility within ten days of his commitment order.

On appeal, the Department presents the following questions, which we have reordered and rephrased slightly, for this Court's review:

1. Did the Circuit Court for Dorchester County err in finding the Department in constructive civil contempt?

2. Did the circuit courts in Baltimore and Kent counties abuse their discretion in imposing sanctions where the Department's failure to admit defendants within the ten-day statutory deadline was the result of a shortage of available hospital beds?

3. Did the circuit courts in Baltimore and Kent counties err in imposing sanctions on the Department in cases where the defendants had already been admitted to a Department facility?

For the reasons set forth below, we shall reverse the judgment of the Circuit Court for Dorchester County, affirm in part, and reverse in part, the judgments of the Circuit Court for Baltimore County, and affirm the judgment of the Circuit Court for Kent County.

## COMPETENCY AND COMMITMENT PROCEDURES

We begin, as we did in *Myers*, with a brief overview of the procedures governing competency evaluations and commitments orders in Maryland, as follows:

> The State may not proceed with a criminal prosecution "against a defendant who is not competent to stand trial." *Powell*, 455 Md. at 527, 168 A.3d 857. A defendant found incompetent to stand trial may not be detained "unless the government is taking steps to provide treatment to restore the defendant to competence or to have the defendant civilly committed." *Id.* The trial court determines "whether a defendant is competent, is dangerous to self or others, and, if incompetent, has the potential to be restored to competence." *Id.* As we previously explained:
>
> > A person is "not competent to stand trial" if he or she is unable "(1) to understand the nature or object of the proceeding; or (2) to assist in one's defense." Md. Code (2017 Supp.), § 3-101(f) of the Criminal Procedure Article ("CP"); *State v. Dixon*, 230 Md. App. 273, 282, 146 A.3d 1223 (2016). When a defendant "appears . . . to be incompetent," the court "shall determine, on evidence presented on the record," whether the defendant is "incompetent to stand trial" ("IST"). CP § 3-104. To aid in this determination, a court may "order the [Department] to

2

examine the defendant," and it "shall set . . . the conditions under which the examination is to be made." CP § 3-105(a).

A defendant may be "confined in a correctional facility until the [Department] can conduct the [competency] examination." CP § 3-105(c)(1). If, however, "the court finds that, because of the apparent severity of the mental disorder . . . , a defendant in custody would be endangered by confinement in a correction facility," the court may order that the Department confine the defendant at a "medical facility that the [Department] designates as appropriate" or "immediately conduct a competency examination of the defendant by a community forensic screening program or other agency that the [Department] finds appropriate." CP § 3-105[c](2)(i). *See Dixon*, 230 Md. App. at 285–87, 146 A.3d [at 1229–30] (Where a court determines that a defendant needs to be confined in a psychiatric facility for his own safety pending a competency evaluation, it may order that the Department admit the defendant to such a facility.). *Accord Powell*, 455 Md. at 529, 168 A.3d [at 863] (A trial court is "charged with determining whether a defendant is in fact incompetent to stand trial and, if so, what to do about it.").

*Myers*, 260 Md. App. at 577-78 (alterations in original) (quoting *Crawford*, 239 Md. App. at 91-92).

Section 3-106(c) of the Criminal Procedure Article sets forth the process for committing a defendant to one of the Department's designated health care facilities.[1] It provides, in relevant part, as follows:

If, after a hearing, the court finds that the defendant is incompetent to stand trial and, because of a mental disorder or an intellectual disability, is a danger to self or the person or property of another, the court shall order the defendant

---

[1] A "designated health care facility" includes "a hospital or private residential facility under contract with the Health Department to house and treat individuals found to be incompetent to stand trial or not criminally responsible." Md. Code Ann., Crim. Proc. ("CP") § 3-106(a)(1)(iii) (2024 Supp.). It "does not include a correctional or detention facility or a unit within a correctional or detention facility." § 3-106(a)(2).

committed to the facility that the Health Department designates until the court finds that:

    1. the defendant no longer is incompetent to stand trial;

    2. the defendant no longer is, because of a mental disorder or an intellectual disability, a danger to self or the person or property of others; or

    3. there is not a substantial likelihood that the defendant will become competent to stand trial in the foreseeable future.

CP § 3-106(c)(1)(i).[2]

In *Powell*, 455 Md. at 542-47, the Supreme Court of Maryland held that the Department did not violate an earlier version of CP § 3-106 when it failed to admit a criminal defendant by the deadline established in his commitment order because the statute in effect at that time did not set "a deadline for admission, or authorize[ ] the court to set one." The General Assembly responded by amending CP § 3-106 to add a ten-day deadline for admission. *See* 2018 Md. Laws 975 (S.B. 233).

Effective October 1, 2018, CP § 3-106(c) now provides:

    (2) If the court commits a defendant to the Health Department under paragraph (1) of this subsection, the Health Department shall:
        (i) admit the defendant to a designated health care facility as soon as possible, but *not later than 10 business days* after the Health Department receives the order of commitment; and
        (ii) notify the court of the date on which the defendant was admitted to the designated health care facility.

                \*       \*       \*

    (4) If the Health Department fails to admit a defendant to a designated health care facility within the time period specified in paragraph (2)(i) of this subsection, the court may impose any sanction reasonably designed to

---

[2] CP § 3-106 was amended in 2024 to substitute "intellectual disability" for "mental retardation" throughout Title 3 of the Criminal Procedure Article. 2024 Md. Laws 14. The revisions went into effect on April 25, 2024. *Id.*

4

compel compliance, including requiring the Health Department to reimburse
a detention facility for expenses and costs incurred in retaining the defendant
beyond the time period specified in paragraph (2)(i) of this subsection at the
daily rate specified in § 9-402(b) of the Correctional Services Article.

CP § 3-106(c) (emphasis added).

As we explained in *Myers*:

After a defendant is committed to a Department facility, the court is required
to hold an annual hearing to determine if the defendant continues to meet the
criteria for commitment. CP § 3-106(d); *Crawford*, 239 Md. App. at 93, 196
A.3d 1. Hearings are also required after a filing by the State's Attorney or
defense counsel setting forth new facts or circumstances related to the
competency determination, or after receiving a report from the Department
with new information relevant to the determination. *See* CP § 3-106(d).

There are several psychiatric hospitals in Maryland where defendants who
are found IST are admitted for treatment and care. Clifton T. Perkins
Hospital Center ("Perkins") is a maximum security facility for defendants
charged with serious crimes. *Crawford*, 239 Md. App. at 93, 196 A.3d 1.
The other four hospitals, Spring Grove Hospital Center, Springfield Hospital
Center, Thomas B. Finan Center, and Eastern Shore Hospital Center, are
regional facilities. *Id*. at 93 n.2, 196 A.3d 1.

260 Md. App. at 580-81 (footnote omitted).

With that background in mind, we now address the particular issues presented in

this appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

The imposition of sanctions and the finding of contempt were based on commitment

orders issued by the circuit courts for Kent, Baltimore, and Dorchester Counties relating to

each of the seven appellees.[3] These orders directed that the appellees be committed to the

---

[3] On September 30, 2024, this Court consolidated the cases of *Maryland
Department of Health v. Jeffrey Boulden*, No. 534, Sept. Term, 2024, with *Maryland*

Department based on a finding that they were IST and dangerous to self or another. Below is a summary of the orders for each appellee.

## I.

## Individual Commitment Orders

## A.

## Kent County Circuit Court

Jeffrey D. Boulden was charged in three separate matters with two counts of second-degree assault, violation of a protective order, and illegal possession of ammunition. On February 2, 2024, the court issued three orders finding Mr. Boulden IST and dangerous and ordering the Department to admit Mr. Boulden to a designated health care facility within ten business days after receipt of the commitment orders. Mr. Boulden was not admitted to a Department facility until April 11, 2024.

## B.

## Baltimore County Circuit Court

Glenn D. Hawkins was charged with second- and fourth-degree burglary, trespass, and second-degree malicious burning. On January 26, 2024, the court found Mr. Hawkins to be IST and dangerous and ordered the Department to admit Mr. Hawkins to a designated

*Department of Health v. Glenn D. Hawkins*, No. 581, Sept. Term, 2024; *Maryland Department of Health v. William Damond Lomax*, No. 582, Sept. Term, 2024; *Maryland Department of Health v. Kennard Jacobi Goins*, No. 641, Sept. Term, 2024; *Maryland Department of Health v. Malik T. Jackson*, No. 643, Sept. Term, 2024; *Maryland Department of Health v. Steven R. Kauffman*, No. 996, Sept. Term, 2024; and *Maryland Department of Health v. Jermell Lamar Savage, Sr.*, No. 1291, Sept. Term, 2024.

health care facility within ten business days after receipt of the commitment order.  Mr. Hawkins was not admitted to a Department facility until April 3, 2024.

William Damond Lomax was charged with 31 offenses, including second-degree assault and offenses relating to the illegal possession of a firearm and ammunition.  On March 13, 2024, the court found Mr. Lomax IST and a danger to himself or others and ordered the Department to admit Mr. Lomax to a designated health care facility no later than ten business days after receipt of the order of commitment.  Mr. Lomax was not admitted to a Department facility until July 24, 2024.

Kennard Jacobi Goins was charged with two counts of first-degree murder and one count of carrying a dangerous weapon with the intent to injure.  On November 3, 2023, the court found Mr. Goins IST and a danger to himself or others and ordered the Department to admit Mr. Goins to a designated health care facility within ten business days after receipt of the commitment order.  Mr. Goins was not admitted to a Department facility until May 6, 2024.

Malik T. Jackson was charged with attempted first-degree and attempted second-degree murder, first- and second-degree assault, wear or carry a dangerous weapon, and related misdemeanor offenses.  On November 6, 2023, the court found Mr. Jackson IST and a danger to himself or others and ordered the Department to admit him to a designated health care facility within ten business days of receiving the commitment order.  Mr. Jackson was not admitted to a Department facility until May 10, 2024.

Steven R. Kauffman was charged with 22 felony sex offenses, including multiple counts of second-degree rape, second-degree sex offense, and child abuse by a custodian.

7

On December 11, 2023, the court found Mr. Kauffman IST and a danger to himself and others and ordered the Department to admit him to a designated health care facility within ten business days of receipt of the commitment order. Mr. Kauffman was not admitted to a Department facility until July 11, 2024.

## C.

### Dorchester County Circuit Court

Jermell Lamar Savage, Sr., was charged with two counts of second-degree assault and one count of resisting arrest. On June 11, 2024, the court found Mr. Savage IST and a danger to himself or others and ordered the Department to commit him to a designated health care facility within ten business days after receipt of the commitment order. On August 30, 2024, after the court found the Department in contempt, it rescinded the earlier commitment order based on its finding that Mr. Savage was competent to stand trial. On the same date, Mr. Savage pled guilty to second-degree assault and was sentenced to ten years' imprisonment, all but 18 months suspended, with a five-year term of probation.

## II.

### Kent County Contempt Proceeding and Statutory Sanctions: Jeffrey Boulden

### A.

### Petition for Contempt and Show Cause Order

On February 24, 2024, Mr. Boulden filed a Request to Show Cause for Contempt of Court, asking the Circuit Court for Kent County to order the Department, through its Secretary, Laura Herrera Scott, M.D., M.P.H. ("Dr. Scott"), to show cause why it had not complied with, and "specifically ignored," the court's February 2, 2024 order requiring it

8

to admit Mr. Boulden within ten business days after receipt of the commitment order. The petition stated that, as of February 26, 2024, Mr. Boulden had not been placed in a Department health care facility and remained jailed at the Kent County Detention Center, which did "not have the necessary facilities to care for or rehabilitate" him.

On March 4, 2024, the court issued an order requiring that Dr. Scott appear at an April 5, 2024 hearing to "Show Cause as to why [Mr. Boulden] has not been admitted to a designated health care facility." The order further required that Dr. Scott respond by April 3, 2024, "in writing with any reason(s) as to why [Mr. Boulden] has not been committed" to a Department hospital.

**B.**

**Show Cause Hearing**

On April 5, 2024, the court held a hearing on the show cause order.[4] Bryan Mroz, Deputy Secretary of Operations in the Department Health Care System, testified that he oversaw 11 facilities, including adult hospitals and the Office of Court Ordered Evaluations and Placements, which included the Centralized Admissions Office. The five adult

---

[4] At the outset of the hearing, the court stated that this Court's opinion in *Myers* had issued "around the time of the show cause or shortly after it was requested and just before the show cause order was issued," and it noted that Mr. Boulden had not requested statutory sanctions. Mr. Boulden's counsel argued that a request for statutory sanctions was "inherent" in its request for a show cause order for non-compliance with § 3-106(c)(2), and if the court found that the Department did not comply with the statute, he could then request sanctions under § 3-106(c)(4) "without specifically having to file the request for them ahead of time." The Department stated that it was prepared to address the issue of sanctions both in argument and with testimony of Bryan Mroz, Deputy Secretary of the Department Health Care System and Operations.

9

psychiatric hospitals were "joint commissioned accredited" and four of the five had "CMS accreditation."[5] These accreditations define the Department's standards of care, including "the facility itself, to patient care, to food, to engineering; everything in the facility." Without the accreditation, the Department would be unable to operate the facilities, and a failure to meet the standards of care could cause it to lose its license.

Mr. Mroz testified that there were 1,056 adult psychiatric beds across the five Department hospitals, and the average length of a patient's stay was "a little over two years." Mr. Boulden was not admitted to a Department facility within the mandated ten-day period because there was a waitlist for admission to a facility. Priority for placement off the waitlist depended on a variety of factors, including when the commitment was received, patient acuity, the existence of a hospital warrant,[6] the type of charges, and length of time on the list. There had been times where the Department had been in compliance with the statutory deadline. At the time of hearing, however, there were 202 individuals on the waiting list for admission to a Department facility, and approximately five hospital warrants had issued the previous night. The cost per day for treatment at a Department facility was approximately $600 to $1,000.

---

[5] CMS stands for the Centers for Medicare and Medicaid Services ("CMS").

[6] A hospital warrant refers to a warrant for a person who is out in the community on conditional release but has violated the conditional release and must return to a Department facility immediately. Patients subject to a hospital warrant receive priority in admissions.

With respect to patient acuity, clinicians at the detention centers examine patients to assess their condition, and their risk to themselves or others. Suicidal or homicidal ideation, non-compliance with medication, and poor somatic condition are acuity factors that would move a patient higher on the waitlist. Mr. Boulden's tentative admission date was April 8, 2024.

When asked why there was a waitlist for beds, Mr. Mroz stated that was "a complicated question," but the "short answer" was that the Department did not have "enough beds for the number of court orders coming in." He stated that there had been a "dramatic increase" in commitment orders "over the past several years," resulting in inadequate capacity at Department facilities.

On cross-examination, counsel for Mr. Boulden introduced a chart submitted by the Department to the legislature, which showed the number of court ordered placements per year. Mr. Mroz testified that, in 2019, there were approximately 750 individuals admitted to a Department facility under court order. The number dropped to 600 in 2020 during COVID. By 2022, however, there were 860 placements by court order, and in 2023, there were 1,100 court-ordered commitments.[7] The chart showed that the number of patients actually admitted within the required ten-day period decreased "consistently from 2019 through 2023." Mr. Mroz stated that there was a period in 2020 and in early 2021 when the Department did meet the ten-day statutory deadline.

---

[7] The data in the chart showed only 800 court-ordered placements in 2023, but Mr. Mroz testified that there were 1,126. He testified that the chart may only show placements for part of the year in 2023.

11

Although staffing had been an issue in the past, the Department at that time had sufficient adult psychiatric staffing "across the board for the beds that [it had]." Inadequate staffing in step-down facilities operated by community providers, however, continued to affect the Department's ability to discharge patients from its five hospitals. The Department was "working with them every day on how to build up the[ir] capacity, to build up their funding, [and] to build up their plans so that they can expand to full capacity." Mr. Mroz explained that "back end" issues related to discharge, in addition to the "front end" issues related to the significant increase in commitment orders, both contributed to the Department's waitlist. On the hearing date, there were approximately 100 patients "clinically ready to be discharged," who had "operational obstacles" to discharge, such as the unavailability of community beds and lack of documentation.

Mr. Mroz testified about the Department's efforts to address the waitlist. In 2017, the Department created a centralized admissions process, which allowed it to "utilize every empty bed in the system" instead of patients being assigned to only one particular hospital. This change helped, and the Department was able to meet the ten-day time limit prior to COVID. Since COVID, the Department had been increasing community step-down beds, and building up assisted living and Residential Rehabilitation Program "RRP" capacity. The Department recently had added "at least 40 [beds] into the community." Many RRP beds were "offline [shutdown] due to staffing or during COVID," so the Department coordinated with these RRP providers to provide financial resources to open up more beds.

It also coordinated with the Behavioral Health Administration ("BHA") to provide funding for adequate staffing for specialized beds that require a high level of care.[8]

The Department also had been undertaking initiatives to address "front end" issues, such as better supporting communities to decrease the number of commitment orders. The Department also worked to find housing for discharged patients so they have "an actual place to stay" and receive their medications.

With regard to undocumented patients, the Department had hired attorneys to assist patients in obtaining required documentation for placement in community facilities, and it "created a linkage through the [Maryland Department of Transportation]" to assist patients in getting necessary licenses. He explained that patients cannot access funding for placements in community facilities without proper documentation, such as a driver's license or birth certificate, because they are "private institutions."[9] Approximately ten percent of the defendants committed to Department facilities are undocumented or under documented.[10] When an undocumented patient is admitted to one of its hospitals, the Department starts working on obtaining documentation "as soon as [it] can" to facilitate discharge. The Department's early intervention has "really facilitated and helped

---

[8] Mr. Mroz explained that the Department could not swap out patients ready for discharge with patients waiting for admission in a detention center because they are court ordered to remain in the hospital until there is a discharge plan, and "often judges will not sign [for release] until [the Department] ha[s] an effective discharge plan."

[9] For some community placements, the Department can fund the placement without payment from a government benefits organization.

[10] An under-documented patient may not, for example, have a copy of his or her birth certificate, driver's license, or social security card.

decrease" the number of patients on the waitlist. The Department also created a pilot program to move patients from the adult psychiatric unit to long-term care, which has different licensure and admissions requirements, and to bring community providers into the hospital to facilitate discharge.

Mr. Mroz next testified about the Department's construction initiatives to increase capacity of its current facilities. The Department sought to ensure that construction would meet the future needs of the system as commitments continued to increase. The Department added beds at Spring Grove Hospital and Springfield by looking "at every unit there was that could meet licensure requirements without renovations and opened them up." It also had plans to expand maximum security beds at Perkins, but it needed to expand capacity at Springfield first. In addition, the Department was "developing a master services plan to address . . . needs in the next . . . 10 to 20 years as [it] move[s] forward." He stated that the Governor's office had made the issue a "very high priority," and the Department received $107 million to build capacity and the resources and supports that he had discussed.

Mr. Mroz explained that the Department could not "just put extra beds in the hallway or . . . rent space in a hotel" to add more capacity because of its accreditation:

> So we have accreditation that stops us from doing that. You know, each patient needs to have a room and needs to have a certain amount of light, needs to have access to bathrooms, needs to have access to medications within a certain, you know, space and needs to have access to the right staffing, the right licensure staff. . . . It would jeopardize our accreditation and licensures if we were to exceed those limits or capacities. It would put us in jeopardy, which could then create a much worse problem.

He stated that courts cannot order defendants to be committed to private hospitals. They could order commitment to the State, and the State can partner with private facilities, but the Department's effort to use private facilities for direct placement after a commitment order was only "mildly successful." The Department put out requests for proposals to private hospitals, but they did not get any effective response. Accordingly, there was "no real ability to transfer or hold [Department] patients in private facilities." Mr. Mroz stated that he believed that private providers were nervous to accept Department patients because of their criminal charges.

Mr. Mroz testified that the imposition of sanctions or providing reimbursement to the detention centers would not induce the Department's compliance with commitment orders, stating: "[W]e are spending millions of dollars trying to resolve this waitlist. I cannot imagine any fine --there's nothing that would help us move faster. We're moving as fast as we can." He noted that the time needed to perform renovations and hire staff were the "impediments" to compliance with the statute. Mr. Mroz stated that the Department was monitoring the waitlist daily to get Mr. Boulden placed and "working as hard as [it could] to comply and get [him] in as quickly" as possible.[11] Mr. Mroz stated that the Department had "no ability at th[at] point" to comply with the court's commitment order, and it was not "a deliberate strategy of delay on the part of the Department."

In his closing argument, counsel for Mr. Boulden requested that the court find the Department in contempt and impose statutory sanctions under § 3-106(c)(4). He argued

---

[11] Mr. Mroz testified that Mr. Boulden was tentatively scheduled to be admitted to a facility on April 8, 2024, but he was not actually admitted until April 11, 2024.

15

that the ongoing problem of the Department not complying with the statutory deadline was not getting better, and the conclusion that needed to be reached was that it was not "really trying."

## C.

## Court's Ruling

The court issued its ruling at the conclusion of the merits hearing. Based on *Myers*, it found that the Department did not willfully violate the court's order for purposes of contempt. With respect to the imposition of statutory sanctions under § 3-106(c)(4), the court stated that, pursuant to *Myers*, a court need only "find that the Department failed to admit an individual deemed IST and dangerous into a designated facility within the statutory 10-day period," "sort of like a strict liability standard." The court then found that the record and testimony clearly established that the Department failed to admit Mr. Boulden within ten days of commitment order, and sanctions were appropriate.

In issuing sanctions, the court stated, as follows:

The testimony that has been offered today indicates that it costs approximately $600 to $1,000 a day to keep an individual in the hospital. So that is sort of like the daily rate that is incurred by the Department for individuals to be held. The Court, therefore, trying to comply . . . with the requirement imposed by that section, that the Court may impose any sanction that is reasonably designed to compel compliance, . . . is going to impose a sanction of $2,000 per day starting today. The purpose of that sanction being to double the cost to the Department through [its] failure to comply with the statute, thereby hopefully incentivizing them to comply with the statute.

The court ordered that the Department pay the sanction, "beginning April 5, 2024, directly to the Clerk of the Circuit Court for Kent County until [Mr. Boulden] is placed."

16

## III.

### Baltimore County Statutory Enforcement and Contempt Actions

The Baltimore County cases initially included a petition for constructive civil contempt filed by Steven Kauffman, as well as four motions for statutory sanctions filed separately by Glenn Hawkins, William Lomax, Kennard Goins, and Malik Jackson. The court consolidated the matters for a hearing on May 8, 2024.

### A.

### Petition for Constructive Civil Contempt and Request for Show Cause Order: Steven Kauffman

On April 4, 2024, Mr. Kauffman filed a Petition for Constructive Civil Contempt and Request for Show Cause Order. He alleged that, on December 11, 2023, the court adjudicated him incompetent to stand trial and a danger to himself or others, and it ordered the Department to admit him to a designated health care facility no later than ten business days after receipt of the commitment order. He stated that he had "been awaiting admission for [112] days as of th[e] filing," and the Department's failure to comply with the commitment order was knowing and willful. Mr. Kauffman acknowledged that the COVID-19 pandemic caused delays in complying with commitment orders, but he stated that "the expectation was that admissions would resume within the statutorily required time frames within a reasonable period of time." He asserted that, more than "three and a half years later, admission delays regularly continue to far exceed the 10-day statutory time frame."

Mr. Kauffman stated that his "safety and well-being, as well as the safety of others, [wa]s in serious jeopardy" because he was not receiving mental health care and treatment. He also argued that the Department's failure to provide competency attainment services within a reasonable time jeopardized his constitutional right to stand trial as a competent individual, and he was "essentially 'committed to jail'" but was "completely thwarted in making any progress towards attaining competency."

**B.**

**Statutory Enforcement Actions**

On March 29, 2024, appellees Glenn Hawkins, William Lomax, Kennard Goins, and Malik Jackson filed separate requests for sanctions against the Department for failure to comply with their respective commitment orders. The motions stated that the defendants had been found IST and dangerous and ordered to be admitted to a Department facility, but that they remained incarcerated at the Baltimore County Detention Center ("BCDC") beyond the ten-day period set forth in the statute and their individual commitment orders. They requested the court to grant a hearing and order sanctions against the Department under CP § 3-106(c)(4).

**C.**

**May 8, 2024 Hearing**

On May 8, 2024, the court held a hearing on the four motions for sanctions and the petition for contempt. Three witnesses testified about the process for admitting defendants to a Department health care facility.

18

**1.**

**Tonya Smith-Barrow**

Tonya Smith-Barrow, the Mental Health Coordinator at the BCDC, was responsible for supervising care on the BCDC's Mental Health Unit, a specialized unit that houses inmates who cannot stay with the general population due to their mental illness. These inmates suffer from any number of mental illnesses, including delusions, psychosis, and mania, and they struggle to maintain activities of daily living, such as showering, personal hygiene, cell cleanliness, and toileting.

They also experience behavioral health problems, including violent physical altercations. These patients are seen by psychiatrists, psychologists, social workers, and counselors, and they typically have daily visits from at least one medical clinician. BCDC officers have to clean up health hazards caused by defendants deemed IST, including insects in cells and feces spread on facility walls. Officers also have been physically threatened by agitated patients who were not compliant with their medication.

As an eight-year-employee of the BCDC, Ms. Smith-Barrow was familiar with the delays involved in admitting defendants found IST to Department facilities. To monitor the transfer process of these defendants, Ms. Smith-Barrow kept a spreadsheet, updated weekly, with the dates on which commitment orders were signed, the dates defendants arrived at the BCDC, and transfer dates to a Department health care facility. She circulated the spreadsheet regularly to defense attorneys and various employees of the judiciary. Of

19

the 52 individuals in the mental health unit, 27 were on the list to be transferred to a Department facility.[12]

Ms. Smith-Barrow testified that Mr. Goins, who was transferred to a Department facility on May 6, 2024, had been on the list since November 3, 2023. Mr. Jackson had been on the list since November 6, 2023, and he was still being detained at the BCDC. Mr. Lomax, whose commitment order was signed on March 13, 2024, and Mr. Kauffman, whose order was signed on December 11, 2023, were also still being detained. Mr. Hawkins was detained for approximately two and a half months before being transferred to a Department facility.

On cross-examination, Ms. Smith-Barrow stated that she was not involved with acuity checks and did not know why Mr. Hawkins was moved ahead of Mr. Goins on the transfer list. She testified that she was not a medical professional.

## 2.

## Hilary Siakor-Sirleaf

Hilary Siakor-Sirleaf served as the Deputy Director for Corrections for the Baltimore County Department of Corrections since 2022. He testified about the difficulties that BCDC correctional officers experienced supervising defendants deemed IST, who were "severely sick" and awaiting transfer to a Department facility. These defendants did not care for themselves, flooded their cells and sometimes the entire unit by placing their food trays and blankets in the toilet, and painted feces on the walls, which correctional

---

[12] The mental health unit houses both inmates that have been deemed IST and those experiencing mental health issues that have not been deemed IST.

officers had to clean. The unit was very noisy and malodorous, and the correctional officers were more like housekeepers. He adjusted the 90-day post normally assigned to correctional officers for the Mental Health Unit to a shorter rotation "because no one c[ould] work in there for 90 days." Mr. Siakor-Sirleaf testified that a clinician formerly housed in the unit to care for the patients had to be moved because of the noise and destruction. When he visited the unit prior to the hearing, it was so loud that he was unable to speak with the officers. He stated that these problems were not present in the general population, with the exception of fighting.

It cost $141.00 per day to house an individual in the BCDC, according to the Department of Public Safety & Correctional Services. This cost did not include the additional costs associated with the extra cleaning required on the Mental Health Unit and related officer retention issues. Mr. Siakor-Sirleaf appealed to the court and the State to "do their best" to transfer IST patients to facilities, where they would have better treatment because the BCDC was not "built to house those kinds of folks."

**3.**

**Brian Mroz**

Brian Mroz, Deputy Secretary of Operations in the Department Healthcare System, testified that his job responsibilities included the admission of defendants into Department hospitals. He explained that, in the Department Healthcare System, there is an Office of Court-Ordered Placement, and within that, a Centralized Admissions Unit. There were 11 facilities in the Department Healthcare System, five of which were adult psychiatric hospitals. He described the accreditations required for the facilities and stated that failure

21

to meet required certification standards could result in the Department losing its license and CMS funding, as well as facility closure.

There are 1,056 beds in the Department's adult psychiatric system, and the average hospitalization lasts "[a] little over" 850 days. Perkins is the State's only maximum security forensics facility and has 189 beds. Mr. Mroz testified that appellees were not admitted within ten business days of their respective commitment orders because the Department did not have an available bed. He explained that every bed in the Department system was "maxxed out," and any vacancy was momentary until the room could be cleaned or clearance was obtained from the detention center. A new patient could be admitted only once an existing patient was discharged. The length of a stay at Perkins was much longer than other Department facilities because the patients have "highly complex" cases.

The number of defendants on the waitlist for a Department facility was at a record high, despite efforts to improve the admissions and community discharge process. In 2017, the Department improved the admissions process to address delays in complying with commitment orders. After "fix[ing]" the admissions process, however, there were issues with community placements, and then the Department noticed "a rapid increase in the number of Court Orders and Court-Ordered evaluations." Hospital warrants had also increased and contributed to the bed shortage.

On the day of the hearing, there were 202 people on the waitlist, and 800 hospital warrants, which are prioritized for placement. Defendants who need treatment at Perkins are not included on the general waitlist for the other Department facilities. Admission to

22

one of the other four Department facilities was based on several factors, including the date of the commitment order, whether a defendant's charges will time out, the resources of the detention facility, and the defendant's acuity. Acuity, which is a "very specific measure of [a defendant's behavior]" based on a clinical decision, impacted movement off the waitlist more than the other two factors. Defendants could move up on the waitlist if their acuity increased due to decompensation resulting in more severe, intense, and complex behaviors. Mr. Mroz explained that the Department tried to "make sure those that need the help the most get in as quickly as we can."

Acuity checks were performed on a weekly basis, and the Department was available around the clock to respond to emails and telephone calls regarding a defendant's acuity. Acuity ratings were based on various factors, including a defendant's homicidal ideations, actual harm to others, suicidal ideations, self-harm, medication compliance, and somatic health. Clinicians who worked at the BCDC were not Department employees, and Mr. Mroz was not aware of each individual clinician's specific qualifications.

Addressing the individual defendants, Mr. Mroz testified that Mr. Kauffman had an acuity check in the past week and was not on the high acuity list. He did not have a tentative admission date. With respect to Mr. Jackson, the detention center and clinician advised he could be maintained safely at the BCDC. He had a tentative admission date of May 9,

23

2024.  Mr. Lomax did not have "acuity issues," and he did not have a tentative admission date.[13]

Mr. Mroz discussed the challenges the Department faced in clearing the waitlist for admission to a Department facility.  He explained that the Department was focusing a lot on securing safe community placements.  The Department maintained an active list of patients that were ready for discharge to a less restrictive environment, but there were operational obstacles that prevented discharge.[14]  Available discharge placements included residential rehabilitation, assisted living, and nursing homes, and patients had "some choice where they go."  The Department had work teams "assigned to each one of those areas . . . to get people moving as quickly and efficiently as possible, always maintaining safety that whole time."

Two assisted living units were located on the grounds of Department facilities:  a 19-bed unit located at Springfield and a 22-bed unit located at the Finan Center.  These units opened in the past two years.  Construction was underway at a building on the Springfield campus to expand assisted living capacity and free up hospital beds.  Certain community placements were reluctant to take Department patients directly from the hospital, but they were more amenable to accepting them if the Department showed that they were successful in the assisted living unit.  The Department also encouraged

---

[13]  Mr. Hawkins and Mr. Goins had been admitted to a Department facility prior to the hearing.

[14]  One of the Department mandates was that patients should be maintained in the least restrictive environment.

community providers to work with patients in Department facilities before discharge to facilitate a faster and smoother transition to community care.

Mr. Mroz described the Department's efforts to address the admissions waitlist. In 2017, the Department undertook an internal review and established an Office of Court-Ordered Placements and Centralized Admissions Unit. This allowed it to "utilize all beds across the system" to improve the efficiency of admissions. In 2021, the Department created the Department Healthcare System to standardize the administration of the State hospitals, which had previously operated independently of one another. Under the new structure, the Department shared best practices and gathered resources to help with placements.

After determining that it needed to expand capacity, the Department began efforts to build more assisted living units and ensure that all of its beds were occupied and fully staffed. Mr. Mroz stated that "building in the state takes quite a long time," but the Department started the building initiatives "many years ago to get through the process." During COVID, many of the community facilities could not remain open due to lack of funding and staffing issues, so the Department "reallocate[d] beds that were not being used" and conduced a state-wide analysis of the location of open beds so it could "take beds that aren't utilized in one area of the state and open up beds in another for RRPs." The Department established grant funding and expanded the number of beds in the assisted living sector, adding 25 beds in 2023. It also added 40 beds to the RRPs, whose licensing requirement are "a little bit more rigid."

25

The Department also initiated a program to address challenges involving discharge of undocumented or under documented individuals to community facilities. Un- and under-documented people comprise ten percent of the Department's hospital system. The Department contracted with attorneys to obtain documentation for these individuals so funding could be secured for a community placement before discharge from a Department hospital. Securing services and funding prior to discharge significantly sped up the discharge process to free up beds, and it had a "big impact on th[e waitlist number]."

Lack of permanent housing also delayed the discharge of patients and slowed down the admissions process. Patients who did not have a place to stay or a permanent address had difficulty receiving their medications and important information from the hospital. To address this issue, the Department opened up 25 beds in partnership with the Maryland Housing Development. In addition, the Department provided funding for a city program called "Capitation," which was underutilized for many years, but was now at full capacity. The Capitation program opened up 50 additional community beds. Mr. Mroz testified that the Department also strengthened its community placement program to ensure that patients were safe in the community and that there was regular communication with community providers to ensure stability of the placement.

Having addressed the admissions process and back-end discharge issues, the Department then began seeing "a dramatic increase on the front end" due to a large increase in the volume of commitment orders and court-ordered evaluations after 2020 and 2021. In 2023, the Department received approximately $100 million from the State to address capacity, placements, and crisis intervention programs. The Department was in the process

26

of adding 44 beds at the Finan Center by relocating the existing assisted living unit and reconfiguring the space to safely house hospital patients. Plans for construction at the Finan Center began in 2020, surveyors were hired in 2021, and at the time of the hearing, the Department was reviewing architectural drawings and preparing to hire contractors. The work was projected to be completed by late 2025.

There also was a project underway to expand maximum security beds at Perkins by 2026, although there was no firm date for the start of construction there. The Department had just hired architects to start site evaluations. Work at the Springfield facility, which was already underway but very complicated, had to be completed before construction at Perkins could begin. The Department's master facility plan, which projected the State's need over the next 20 years, included construction of a new building on the grounds of Springfield, the planning for which was underway, as well as currently surveying for expansion at Spring Grove.

Mr. Mroz testified that a law had been passed for court-ordered outpatient therapy, and the Department was working on setting up that operation. It was "another tool that can be used to help people who . . . could end up on [the Department's] waitlist"; it gave an option to reduce the waitlist.

With regard to sanctions for failure to comply with commitment orders, Mr. Mroz testified that sanctions would not induce compliance because the Department was "spending millions and millions of dollars trying to solve this. Hundreds of millions if you count the money from the Moore-Miller . . . Administration." He stated that the Department was "trying to do everything we can to get in compliance . . . spending . . .

thousands and thousands of man hours working on this." Mr. Mroz testified that a fine would not overrule the Department's clinical decisions, and the real problem was bed space. He agreed that the bed problem had been an issue for at least ten years. He stated that the Department's failure to admit defendants within ten business days of the court order was not a willful violation or a deliberate strategy of delay because it did not have the ability or opportunity to comply.

On cross-examination, Mr. Mroz testified that the Department's bed capacity had not changed since the last time he had been in court, approximately seven months earlier. The Department still had 1,056 beds available. At the time of his earlier testimony, there were 174 people on the waitlist, and at the time of the hearing, there were 202 people on the waitlist, an increase of 28 people.[15] He stated, however, that capacity was only one issue. Facilitation of community placements to allow for discharge and prevention of commitment orders in the first place "would reduce the waitlist faster than building a bed."

_____

[15] The testimony in *Md. Dep't of Health v. Myers*, 260 Md. App. 565, 590-91, *cert. denied sub nom. Sanders v. Md. Dep't of Health*, 487 Md. 267 (2024), was that, at the time of the hearing in December 2022, there was a waitlist of 130 patients. The testimony here indicates that there had been an increase of 72 persons on the waitlist during these 17 months. The waitlist continues to grow as this appeal is pending. We take judicial notice of a recent filing by the Department in this Court stating that, as of April 2024, the wait list was 221 people. *See* Am. Mot. For Stay Pending Appeal, *Md. Dep't of Health v. Young, et al.*, No. 442, Sept. Term, 2025, at 6; *Leake v. Johnson*, 204 Md. App. 387, 414 n.9 (2012) (court is permitted to take judicial notice of pleadings filed in another court proceeding).

Mr. Mroz explained that there had been an increasing number of committed defendants, from 500 four or five years ago to a record number of 1,100 in 2024.[16]

Diversion of defendants in low-level cases from the criminal justice system would help. Mr. Mroz stated that this issue had been discussed across the state. The Department had recently set up crisis intervention teams across the State, which was part of the $107 million from the Moore-Miller administration, and it was hiring staff and securing technology to build the program. The Department was working with some jurisdictions across the state, including Montgomery County and Anne Arundel County, on diversion techniques to prevent arrests.[17]

Mr. Mroz testified that, by the end of 2026, the Department would have approximately 120 additional beds available for defendants committed to Department facilities. He acknowledged, however, that the current waitlist was 202 people and continued to increase. He explained that capacity was only one issue, and front-end interventions to reduce the number of commitment orders would also impact the wait list.

**D.**

**Court's Ruling on the Record**

The court issued a ruling on the record after closing arguments. It began by noting that CP § 3-106(c)(4) "was revised in 2018 as a result of the very problems that we're

---

[16] In *Myers*, 260 Md. App. at 589-91, Atif Chaudry, then-Deputy Secretary of Operations for the Department, testified that the number of commitment orders in 2022, as of December 16, 2022, was 827.

[17] Mr. Mroz testified that Montgomery County had the highest number of defendants with commitment orders, followed by Baltimore City and Baltimore County.

attempting to address today." It stated that the legislature gave the court the tool of a sanction to enforce commitment orders because it was so difficult to prove the willful non-compliance necessary for a contempt finding. The court found that "the Department really has not made sufficient efforts . . . to address the problem," which started "many years prior to 2018."

Citing *Myers*, the court stated that § 3-106(c)(4) "permits sanctions based on a [mere] failure to comply with a 10-day deadline if the sanctions are reasonably designed to compel compliance." The court stated that it did not believe the testimony that sanctions would not compel compliance, noting first that "the mere fact that efforts weren't made in 2018 to start to address the problem in itself, cries out for a sanction," and then stating that, as the number of commitment order violations increases, the monetary sanction for each case will coerce compliance "once the Department is made to understand that they will have to pay the monetary sanction."

The court held that, for each of the five appellees, the Department clearly violated the statute by failing to commit the appellees to a Department facility within ten business days of the commitment order. It found that the imposition of sanctions under the statute in each of the five cases would compel compliance. The court imposed a sanction of $1,000 for each day the appellees remained in detention past the ten-day statutory period. The sanctions for each appellant were, as follows:

- Mr. Lomax: $46,000 based on March 13, 2024 commitment order and an 8-week delay in admission.

- Mr. Hawkins: $67,000 based on a January 26, 2024 commitment order and his admission on April 3, 2024, a 67-day delay.

30

- Mr. Goins: $182,000 based on a November 3, 2023 commitment order and his admission on May 6, 2024, a 182-day delay.

- Mr. Jackson: $174,000 based on a November 6, 2023 commitment order and a 174-day delay in admission, at the time of the hearing.

- Mr. Kauffman: $139,000 based on a December 11, 2023 commitment order and a 139-day delay in admission, at the time of the hearing.

**E.**

**Court's Reconsideration: Mr. Kauffman**

On May 15, 2024, the court, *sua sponte*, reconsidered its ruling in the case involving Steven Kauffman because that matter was brought as a contempt action, not as a motion for sanctions, and therefore, the statutory sanction did "not automatically apply." The court denied Mr. Kauffman's petition for contempt and struck the sanction imposed without prejudice, noting that counsel was free to file a motion for sanctions incorporating the testimony and arguments from the May 8, 2024 hearing, unless the Department objected.

On May 24, 2024, Mr. Kauffman filed a motion for sanctions pursuant to § 3-106(c)(4), requesting that the court incorporate the testimony, arguments, exhibits, and evidence presented at the May 8, 2024 hearing. He requested the court issue an order imposing sanctions against the Department in the amount of $139,000 and directing the Department to transfer him to an appropriate Department facility.

On July 9, 2024, the court held a hearing to determine whether the Department had taken any action since the May 8, 2024 hearing to admit Mr. Kauffman. Amelia Tibbett, the Acting Director for the Department's Office of Court Ordered Evaluations and Placements, testified that she supervised the entire admissions process for defendants

deemed IST and dangerous. She stated that the Department had exceeded the admissions deadline in Mr. Kauffman's commitment order by 139 days, and since the May 8, 2024 hearing on the contempt petition, the Department had not taken any additional steps to admit Mr. Kauffman other than consistently managing the waitlist, monitoring acuity, and assessing current patients to determine whether discharge was appropriate.

The Department was in the procurement process for additional beds at its Perkins and Springfield facilities. At Springfield, the Department was refitting an outdated area to add 40 beds that would comply with hospital standards, and at Perkins, it planned to convert minimum security beds to maximum security beds, which would increase maximum security capacity by 20 beds. Groundbreaking for these projects was expected in 2025, but the Department was "still working on different aspects of gearing up for this project." It was also looking for additional sites.

Mr. Kauffman's charges mandated that he be admitted to Perkins, and he was number three on the waitlist for that facility.[18] The Department had plans to add capacity at Perkins, but Ms. Tibbett did not know of any plans to build another maximum security facility. Ms. Tibbett testified that the only factor that would "speed up his placement would be . . . decompensation of his acuity," and any defendant subject to a hospital warrant would have admission priority over Mr. Kauffman. The detention centers designated a clinical professional to receive and conduct acuity assessments every two weeks from the

---

[18] Ms. Tibbett testified that, after Mr. Kauffman's May contempt hearing, Perkins had experienced a measles and scabies outbreak, which halted new admissions for approximately one week.

Department's Central Admissions Office. Clinical teams within the Central Admissions Office reviewed acuity assessments from the detention centers. If a defendant was listed as acute, the Department requested relevant medical records and initiated the process for hospital admission. Mr. Kauffman was not listed in an acute status during his acuity check on June 27, 2024.

At the close of evidence and after brief closing statements, the court issued a sanction against the Department of $1,000 for each day the Department exceeded the ten-day admission requirement of the commitment order, for a total of $191,000, stating that "the length of time that [Mr. Kauffman] has been languishing in prison, as opposed to in a hospital, is, quite frankly, outrageous and a clear violation of the statute." The court acknowledged that the government procurement process was lengthy, but it stated that, "if there really was a concerted effort being made, it would seem to me that that may have happened a long time ago." Although acknowledging that the Department had an ethical obligation to admit the most seriously ill patients, the court stated that did not change the requirements of the statute. The court did not find any evidence of an inability to comply with the statute's ten-day admission requirement, noting that the bed capacity issues were "long-standing and ha[d] not been adequately addressed." The court held that, regardless of the Department's ability to comply, the statute permitted a sanction designed to encourage compliance. It stated that the $191,000 sanction was sufficient to do that.

The court issued a written order on July 10, 2024, imposing a sanction of $195,000 against the Department. It ordered the Department to deposit those funds into the Registry of the Court.[19]

## IV.

## A.

### Dorchester County Contempt Proceedings: Jermell Savage

On August 13, 2024, Jermell Savage filed a Petition for Constructive Civil Contempt and Request for Show Cause Order against the Department and its officials, alleging that the Department failed to admit him to a designated health care facility within ten days of his commitment order. He stated that he had remained at the local detention center for approximately 64 days after his June 11, 2024 commitment order, and he continued to exhibit symptoms of serious mental illness, which endangered himself and others. He also argued that the Department's failure to comply with his commitment order violated his constitutional right to stand trial as a competent individual.

On August 20, 2024, the court issued a show cause order for the Department to file a response to the petition for contempt no later than August 21, 2024, and to appear for a hearing on August 23, 2024. As discussed in more detail, *infra*, the court found, after a

---

[19] There was some confusion below regarding who ultimately would receive the money from the sanctions. At oral argument, counsel for the Department stated his belief that the money went to the detention center or the County, and counsel for appellees stated that he was not sure where the money would go, but it could go to the detention center. The General Assembly may want to clarify who ultimately receives the money from the sanctions imposed.

hearing, that the Department was in constructive civil contempt of the court's June 2024 order.

This appeal followed.

## DISCUSSION

We will begin our analysis with the Department's challenge to the contempt order issued by the Circuit Court for Dorchester County. We will then discuss the challenges to the imposition of sanctions in the Kent County and Baltimore County cases.

### I.

### Contempt Order: Jermell Savage

### A.

### Substantive Law on Contempt

The contempt order here was for constructive civil contempt. Constructive contempt, unlike direct contempt, occurs outside "the presence of the judge presiding in court or so near to the judge as to interrupt the court's proceedings." *Breona C. v. Rodney D.*, 253 Md. App. 67, 73 (2021) (quoting Maryland Rule 15-202). As we explained in *Myers*, 260 Md. App. at 615:

> Civil contempt proceedings are "intended to preserve and enforce the rights of private parties to a suit and to compel obedience" with court orders and decrees. *Dodson v. Dodson*, 380 Md. 438, 448 [845 A. 2d 1194] (2004) (quoting *State v. Roll and Scholl*, 267 Md. 714, 728 [298 A.2d 867] (1973)). "Civil contempt 'proceedings are generally remedial in nature and are intended to coerce future compliance.'" *Royal Inv. Group, LLC v. Wang*, 183 Md. App. 406, 447 [961 A.2d 665] (2008) (quoting *Roll*, 267 Md. at 728 [298 A.2d 867]), *cert. granted*, 408 Md. 149 [968 A.2d 1064] (2009), *appeal dismissed*, 409 Md. 413 (2009). Regardless of the penalty imposed in a civil contempt action, it "must provide for purging." *Dodson*, 380 Md. at 448 [845 A.2d 1194]. A purge provision offers the party "the opportunity to exonerate

35

him or herself, that is, 'to rid him or herself of guilt and thus clear himself of the charge.'" *Jones v. State*, 351 Md. 264, 281 [718 A.2d 222] (1998) (quoting *Lynch v. Lynch*, 342 Md. 509, 520 [677 A.2d 584] (1996)).

(alterations in original) (quoting *Crawford*, 239 Md. App. at 119). The burden of proof

for civil contempt is a preponderance of the evidence. *Gertz v. Md. Dep't of Env't*, 199

Md. App. 413, 423, *cert. denied*, 423 Md. 451 (2011).

The failure to comply with a court order alone is not sufficient to support a finding

of contempt. *Myers*, 260 Md. App. at 616. Rather, "[u]nder settled Maryland law, one

may not be held in contempt of a court order unless the failure to comply with the court

order was or is willful." *Dodson*, 380 Md. at 452. Willful conduct is

> "action that is '[v]oluntary and intentional, but not necessarily malicious.'" [*Gertz*, 199 Md. App.] at 430, 23 A.3d 236 (quoting *Royal Inv. Group, LLC v. Wang*, 183 Md. App. 406, 451, 961 A.2d 665 (2008). A contempt finding requires a showing that the inability to comply with a court order "arose 'from a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court.'" *Dorsey v. State*, 356 Md. 324, 354, 739 A.2d 41 (1999) (quoting *In re Ann M.*, 309 Md. 564, 569, 525 A.2d 1054 (1987)). Although evidence of a defendant's conduct that purposefully renders the defendant unable to comply may give rise to an inference that the defendant acted willfully and with knowledge, the *mens rea* of contempt "must be established by evidence, and cannot simply be 'assumed.'" *Id.* at 352, 739 A.2d 41 ("purported judicial notice" that defendant "could 'probably make $240 a week while working at one of the fast food places'" was insufficient to support inference of willfulness).

*Myers*, 260 Md. App. at 618.

"A negligent failure to comply with a court order is simply not contemptuous in a

legal sense." *Dodson*, 380 Md. at 452. Thus, "[a]n adjudication of civil contempt, based

upon mere negligent inaction and not upon willful conduct, is flatly inconsistent with

[Maryland law]." *Id.* at 453. The court "need not explicitly use the word 'willful' to find

36

a defendant in contempt, provided that 'the court's ruling, when read as a whole, clearly implies that' the court found the defendant's conduct willful.'" *Sayed A. v. Susan A.*, 265 Md. App. 40, 72 (2025) (quoting *Bahena v. Foster*, 164 Md. App. 275, 288 (2005)).

In *Myers*, 260 Md. App. at 576, we were presented with the same issue we are presented with here, i.e., whether the circuit court properly found the Department in contempt for willfully failing to comply with court orders to admit two defendants found IST and dangerous to a Department facility within the ten-day time limit required by statute. The Department presented evidence of a significant increase in commitment orders, a nationwide staffing crisis, an increase in undocumented patients, and on-going COVID outbreaks in support of its argument that it was unable to comply with the commitment orders. *Id.* at 619. There was evidence that the Department was treating the delays as an emergency and had made significant efforts to address the issue, including hiring immigration attorneys, increasing bed capacity and community discharge placements, and regularly coordinating with the judiciary to expedite discharge hearings. *Id.* at 621-22, 625. Because there was "no evidence that the Department had a bed available for appellee or that the failure to admit Mr. Myers to a psychiatric facility was deliberate and willful," we held that the record did not support a finding that the Department willfully failed to comply with the court's order. *Id.* at 620. Accordingly, we held that the court's finding of willfulness was clearly erroneous, and we reversed the circuit court's findings of contempt. *Id.* at 626.

37

## B.

## Parties' Contentions

The Department contends that the circuit court erred in finding it in contempt. It argues that its failure to comply with Mr. Savage's commitment order was not willful because it lacked the ability to comply with the order. It states that there was no dispute that no beds were available, and the court acknowledged the reality that the Department could not timely comply with commitment orders because it did not "'have sufficient resources' to do so." The Department asserts that the court's contempt finding, therefore, was "an impermissible effort to punish the Department for not admitting Mr. Savage within 10 days of the commitment order, rather than to coerce compliance." The Department contends that our decision in *Myers* requires that the contempt finding must be vacated because the record here demonstrates "even more clearly" that its failure to comply with the commitment order was not willful.

Mr. Savage argues that the record supports the court's finding of contempt, and the court properly concluded that the Department's failure to admit Mr. Savage within ten days of the commitment order was willful. He asserts that "negligence to comply with a court order may be so entrenched and systemic that it constitutes the functional equivalent of willfulness," and the record here, "at the very least, reflects such willfulness." He contends that there are "key differences between the record in *Myers* and the record" here that support the court's contempt finding in this case.

## Proceedings Below

### 1.

### Hearing Testimony[20]

On August 23, 2024, at the hearing on the show cause order, Ms. Tibbett testified that the Department had received approximately 1,126 commitment orders at that point in 2024, and the total combined bed capacity for the five department hospitals was 1,056. There were 211 defendants on the waitlist, with 46 defendants waiting for a bed at Perkins. The wait time for a bed at Perkins, the only maximum security hospital, was close to eight months.

The court committed Mr. Savage to a Department facility on June 11, 2024, and 59 business days had passed since the order. No additional beds were added to Department health care facilities in 2024, but the Department had added 63 additional beds since 2019. Ms. Tibbett testified that the Department was no longer experiencing a staffing shortage impacting its bed capacity. The cost to house a patient was $586 per day at a Department facility and $45 per day at a local detention center.

Ms. Tibbett discussed the legislative efforts made to address the bed shortage at Department facilities. The Department had tried, without success, to amend the statute to lengthen the required admissions time beyond the current ten-day period. The General

---

[20] At the start of the hearing, the court chastised the Department for failing to file a response to the petition for contempt as ordered by the court, noting that the Department's "inability to comply with court orders" was the reason for the hearing.

Assembly did pass legislation authorizing outpatient therapy as an alternative to merely placing defendants on a waitlist after receiving a commitment order. The outpatient therapy program was supposed to start sometime in 2024. The Department had plans to add additional beds in 2025, but Ms. Tibbett was unsure if recent budget cuts would impact those plans.

On cross-examination, Ms. Tibbett explained that the five Department hospitals were all accredited by the Joint Commission and licensed by the Department's health care quality division, and that four of the five hospitals were also certified with CMS and Medicaid. If the Department were to lose those accreditations and certifications, the Department facilities would face closure, fines, and discontinued CMS payments. Licensing restrictions limited the amount of beds that hospitals were permitted to have and dictated the levels of security required for patient safety. The Department, therefore, could not place additional beds in hallways or rent extra space to alleviate the bed shortage.

Ms. Tibbett explained that Mr. Savage had not been admitted to a Department facility because there had been no discharges at the Eastern Shore Hospital Center, and his stable status did not qualify him to be placed at another facility. Placing him at another hospital with an open bed "would bump a more acute patient." In addition, defendants with hospital warrants get priority over those on the waitlist from a commitment order. Ms. Tibbett explained, consistent with testimony in other cases, other factors that contributed to the delay in admitting defendants, including a bed shortage in community facilities receiving patients discharged from Department facilities, as well as patients with immigration and documentation issues.

40

The newly enacted outpatient therapy model, scheduled to start in October 2024, was designed to alleviate the admissions backlog by offering outpatient resources for defendants charged with misdemeanor offenses. It would be an option for these defendants to go there instead of to a Department facility. In addition, the Department was in the process of adding 44 additional beds between Springfield and Perkins by 2025.

Ms. Tibbett testified that sanctioning the Department or ordering it to reimburse the detention center would not induce compliance with the commitment order because "[t]he fact remains we just don't have a bed available." The Department did not have an ability to comply with the commitment order, and its violation of the ten-day admissions requirement was not willful or a "deliberate strategy of delay on the part of the Department."

**2.**

**Court's Ruling**

The court issued a ruling on the record at the end of the hearing. It noted that the issue of delayed admission of defendants committed to the Department had "frustrated trial judges across the state." The court stated that, "in a civilized society, we don't continue to incarcerate individuals with mental health struggles," who "should not be languishing in jail for excessive periods of time." The court noted that, in *Myers*, there were problems due to COVID and staffing issues, and this Court stated that the Department was treating the admissions delays as an emergency, exploring all options to fix the problem. In this case, however, COVID was not presenting the same issues and there was not a staffing issue. The court found that Mr. Savage still was not admitted 59 days after he should have

41

been admitted to a Department facility. The court concluded that the Department was not "exploring all options available to remedy the problem." Although recognizing that there was a budget shortage in the state, the court opined that the State had "massive budgets with a lot of areas that can be cut," and "[t]here should be a massive public relations and lobbying campaign[ ] in Annapolis to pressure the lawmakers to provide the resources." It stated that when the Department cannot "implement the [c]ourt orders because they don't have sufficient resources, I believe it's incumbent upon the Executive branch of government to go to Annapolis and lobby forcefully to try to get the resources necessary to create the beds." The court stated that the Department's efforts to get the General Assembly to extend the ten-day deadline, instead of "asking for the resources to get mentally ill people out of jail and into the place they belong," was "shocking" and "really bothers me."

Accordingly, the court found the Department in constructive civil contempt of the court's June 11, 2024 order. It ordered as a sanction that the Department pay $1,000 for each business day that Mr. Savage remained at the detention center and was not transferred to a Department facility. The court stated that the contempt could be purged by compliance with the court's June 11, 2024 order.

## D.

### Standard of Review

We reverse a court's contempt finding "only when there is a showing that the findings of fact on which the contempt order is premised were clearly erroneous or that the court abused its discretion." *Myers*, 260 Md. App. at 614. "In reviewing factual findings

42

on which a contempt order is based, '[i]t is not our task to re-weigh the credibility of witnesses, resolve conflicts in the evidence, or second-guess reasonable inferences drawn by the court, sitting as fact-finder.'" *Id*. at 618 (alteration in original) (quoting *Gertz*, 199 Md. App. at 430). "We must view 'the evidence and all inferences drawn therefrom . . . in the light most favorable to . . . the prevailing party' and decide whether the evidence 'is sufficient to support the court's finding of willfulness.'" *Id.* (alterations in original) (quoting *Gertz*, 199 Md. App. at 430). The interpretation or application of statutory or case law in a contempt order is reviewed de novo. *Sayed A.*, 265 Md. App. at 70.

## E.

## Analysis

It is undisputed that the Department failed to admit Mr. Savage to a Department facility within ten business days, as required by CP § 3-106(c)(4). The issue presented here is whether the evidence supported the court's finding that the Department's failure to comply with the commitment order was willful.

Here, as indicated, the court based its contempt order on its finding that, unlike in *Myers*, the Department was no longer handling the admission delays as an emergency, and the Department was not "exploring all options available to remedy the problem." Based on these findings, it concluded that the Department's failure to admit Mr. Savage was willful.

We agree with the Department that the evidence was insufficient to support the finding of willfulness. The only **evidence** presented here was that the Department was unable to admit patients within the ten-day statutory deadline because there were not

43

enough beds. Although the evidence here was different from that in *Myers*, and there were not the same COVID issues or staffing shortages, there was testimony regarding why the Department was unable to comply with the court order. Ms. Tibbett testified about the large number of commitment orders, stating that there were 1,226 commitment orders as of that date, August 23, 2024, and the Department had a bed capacity of only 1,056.[21] There were a total of 211 defendants on the waitlist, 165 waiting to be admitted to one of the four regional hospitals, and 46 waiting to be admitted to Perkins. Ms. Tibbett stated that the Department did not "have enough beds to keep up with the number of orders." She noted that hospital warrants also delayed admissions from the waitlist because defendants subject to warrants get priority over defendants in detention centers.

There also was a backlog of patients on the back end of the process, patients who were medically ready to be discharged, but were waiting for a discharge placement. This also contributed to admissions delays. Ms. Tibbett stated that 93 patients were delayed from being discharged because there were no open beds in the community to accept them or because the patients were undocumented or under documented.

A review of the record shows that the only evidence presented was that the Department was not able to comply with the court order because it did not have enough beds. The court's finding of willfulness was based on its finding that, in this case, unlike in *Myers*, the Department was not "exploring all options" to address this bed shortage, and

---

[21] Based on the record in this case and the *Myers* case, the volume of commitment orders appears to have significantly increased since 2018, with 537 orders in 2018, approximately 855 orders in 2022, and 1,226 as of August 2024.

when the Department does not have sufficient resources to comply with court orders, it should forcefully lobby the legislature to get those resources.[22]

There was evidence, however, that the Department had taken action to alleviate the bed shortage, and there still were not enough available beds to comply with the court order.[23] Ms. Tibbett testified that the Department was granted $107 million in the previous year to address the bed shortage. This indicates that the Department sought and obtained significant resources to address admission delays. Ms. Tibbett testified that the Department was using this money for "community resources, community beds, upgrades, things to try to make [conditions safe] for . . . defendants in the community." Ms. Tibbett stated that, if the Department could "discharge patients from the hospital, that opens up beds for [it] to be able to" admit new defendants. There also was testimony that the Department was in the process of adding 44 additional beds between Springfield and Perkins in 2025.

It is clear that the circuit court thought that the Department was not doing enough to alleviate the bed crisis. We certainly understand the court's frustration that the problem of delay in admitting IST patients is still ongoing after so many years. Without **evidence**

---

[22] The Department states in its brief, briefly, that the court's comments in this regard raise "significant separation-of-powers concerns." It does not, however, raise that as an issue on appeal. It does not make any argument that Md. Code Ann., Crim. Proc. ("CP") § 3-106(c)(4) (2024 Supp.) is unconstitutional. Accordingly, we will not address any issues in that regard.

[23] There was no evidence regarding the continuing effects of COVID. We note, however, that the Department stated in one of the related matters that infectious disease outbreaks other than COVID continued to cause the Department to temporarily pause admissions at its facilities.

that the Department could have obtained more funding, however, or that it made a deliberate effort not to pursue options to solve the lack of beds, a constructive civil contempt finding cannot be made.[24]  The mens rea element of civil constructive contempt, namely, showing "a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court," must be proved with evidence, either direct or circumstantial; it cannot be assumed. *Dorsey*, 356 Md. at 352 (quoting *In re Ann M.*, 309 Md. at 569).  As indicated, there was no such evidence here.

Appellee contends, relying on *Gertz*, 199 Md. App. at 431, that "negligence to comply with a court order may be so entrenched and systemic that it constitutes the functional equivalent of willfulness," and the record here reflects at least this type of willfulness.  We addressed a similar contention in *Myers*, summarizing the court's holding in *Gertz*, as follows:

> In *Gertz*, relied on by the appellees, we held that willfulness may be shown when a defendant purposefully renders himself unable to comply and engages in a deliberate strategy of delay. 199 Md. App. at 431–32, 23 A.3d 236.  In that case, we concluded that the court properly drew an inference of willfulness in the defendant's failure to perform required environmental remediation because he only "occasionally stopped by [the] engineer's office" hired to obtain the required permits, but he did nothing more in the over three-year period after the court order.  *Id.* at 433, 23 A.3d 236. The court thus found that he "deliberately dragged his feet in submitting" the required plans and put off compliance with the order.  *Id.*

---

[24]  This is especially true given the court's acknowledgment that "there's a budget shortage, everyone who picks up the newspaper or goes online sees that."

*Myers*, 260 Md. App. at 625 (alteration in original). We concluded in *Myers* that the analogy to *Gertz* was not applicable where "there was no *evidence* that the Department was deliberately dragging its feet in trying to admit Mr. Murphy or any of the committed individuals." *Id.* at 626. A negligent failure to comply with a court order cannot sustain a finding of constructive civil contempt. *Dodson*, 380 Md. at 452 (negligent failure to comply is not contemptuous).

As in *Myers*, the court here did not have evidence to support its finding that the Department's failure to admit Mr. Savage within ten business days of his commitment order was willful. Its finding that the Department willfully violated Mr. Savage's commitment order, therefore, was clearly erroneous, and the court abused its discretion in finding the Department in contempt.

## II.

### Statutory Sanctions

With respect to the other six cases at issue in this appeal, the courts imposed sanctions pursuant to CP § 3-106(c)(4). The Department contends that the Circuit Court for Kent County and the Circuit Court for Baltimore County erred in these six cases in imposing statutory sanctions against it. We will collectively refer to the defendants in the sanction matters as "appellees," except where otherwise noted.

As indicated, CP § 3-106(c)(4) states that, if the Department violates the ten-day requirement for placing a defendant in a Department facility, "the court may impose any sanction reasonably designed to compel compliance, including requiring the Health Department to reimburse a detention facility for expenses and costs incurred in retaining

47

the defendant beyond the [ten-day] time period . . . at the daily rate specified in § 9-402(b) of Correctional Services Article."[25]  The imposition of sanctions pursuant to CP § 3-106(c)(4), unlike in a contempt case, does not require a finding of willfulness; the statute "permits sanctions based on a mere failure to comply with the 10-day deadline, if the sanctions are 'reasonably designed to compel compliance.'"  *Myers*, 260 Md. App. at 630.

In assessing the court's sanctions orders here, we note that there are three different standards of review to consider:

> An evidentiary finding made under a statute authorizing sanctions is reviewed under a clearly erroneous standard.  *See, e.g.*, *Zdravkovich v. Bell Atl.-Tricon Leasing, Corp.*, 323 Md. 200, 210-11, 592 A.2d 498 (1991).  Whether to award sanctions, and the amount of sanctions awarded, is reviewed for an abuse of discretion.  *Garcia v. Foulger Pratt Dev., Inc.*, 155 Md. App. 634, 676-77, 845 A.2d 16 (2003).  Questions of statutory interpretation, however, are reviewed *de novo*.  *Elsberry v. Stanley Martin Cos. LLC*, 482 Md. 159, 178, 286 A.3d 1 (2022).

*Id*.

## A.

### Sanctions Reasonably Designed to Compel Compliance

The Department contends that sanctions were erroneously imposed here because they were not "reasonably designed to compel compliance."  In support, it argues that there were no available beds for the appellees as a result of factors "outside the Department's control," they were "making extensive efforts to alleviate the shortage of beds," and under

---

[25] The daily rate specified in Section 9-402(b) of the Correctional Services Article is "at least $45" per day.  Md. Code Ann., Corr. Servs. ("COR") § 9-402(b) (2024 Supp.).

the circumstances, "no monetary sanction would compel compliance."  The Department asserts that, by issuing sanctions after the Department established that there were no beds available, "the sanctions serve as a penalty" for past conduct and "hamper the Department's ability to carry out its statutory and medical obligations."  With respect to Mr. Hawkins and Mr. Goins, the Department additionally argues that it had already admitted them at the time the sanctions were imposed, and therefore, "there was no compliance for the court to compel."

Appellees contend that the courts properly imposed sanctions under CP § 3-106(c)(4).  They assert that there is no dispute that the Department failed to admit them within the ten-day statutory deadline, there is no argument that the amount of the sanctions was not reasonable, and the court was free to disbelieve the testimony by the Department that the sanctions would not reasonably compel compliance with the statute.  With respect to Mr. Goins and Mr. Hawkins, who had been admitted to a Department facility before the court issued the sanctions, appellees argue that, although a party typically may not be held in civil contempt if they have already complied with a court order, sanctions under § 3-106(c)(4) are permitted in cases where the defendant has been placed in a Department facility, but the placement was delayed until after the ten-day statutory deadline.

As indicated, the Department's sole challenge to the sanctions here is that they were not reasonably designated to compel compliance with the ten-day deadline to admit the defendants.  It points to testimony by Department witnesses that sanctions would not compel compliance because there were no beds.  We rejected that same contention in *Myers*, noting that the circuit court was "not obligated to believe that testimony and had

49

significant discretion 'to accept – or reject – *all, part, or none* of the testimony of [the] witness.'" 260 Md. App. at 630 (alteration in original) (quoting *Goicochea v. Goicochea*, 256 Md. App. 329, 349 (2022)). This Court gives deference to the circuit court's assessment of a witness' credibility. *Id. Accord Att'y Grievance Comm'n v. Johnson*, 462 Md. 422, 434 (2019) (deference given to hearing judge who, as fact-finder, was in best position to assess witness credibility).

Moreover, even if the court believed the testimony that the Department could not comply with the court orders, that would not categorically preclude sanctions pursuant to CP § 3-106(c)(4). In determining whether the statute permits sanctions if there were not sufficient beds to comply with the court orders, we apply established principles of statutory construction "to determine legislative intent." *State v. Krikstan*, 483 Md. 43, 65 (2023). "A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021) (quoting *Lockshin v. Semsker*, 412 Md. 257, 274 (2010)).

To determine the intent of the General Assembly, we begin with the words of the statute, giving them their ordinary meaning, *see Montgomery County v. Cochran*, 471 Md. 186, 221 (2020), and we "presume that the [l]egislature intends its enactments to operate together as a consistent and harmonious body of law." *In re Abhishek I.*, 255 Md. App. 464, 472 (2022) (quoting *Gerety v. State*, 249 Md. App. 484, 498 (2021)). "[W]e seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope." *Id.* (quoting *Gerety*, 249 Md. App. at 498). "If the language

50

of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction." *Id.* (quoting *White v. State*, 250 Md. App. 604, 638 (2021)).

When the words of a statute are ambiguous, however, either because they are subject to more than one reasonable interpretation or because "the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia." *Blackstone v. Sharma*, 461 Md. 87, 113 (2018) (quoting *State v. Bey*, 452 Md. 255, 266, (2017)). As we have explained: "Other indicia may include 'the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process.'" *Vanderpool v. State*, 261 Md. App. 163, 181 (quoting *Wheeling*, 473 Md. at 377), *cert. denied*, 487 Md. 461 (2024).

Here, the statute does not define the term "reasonably designed to compel compliance." To the extent that this term is ambiguous, the legislative history makes clear that the legislature was frustrated by delays in admissions to Department facilities, and its intent was to impose a deadline for admission, with sanctions to enforce compliance with the statutory mandate.

As indicated, the ten-business-day admission deadline was enacted by the General Assembly after the decision in *Powell*. In that case, the circuit court issued commitment orders requiring that defendants found IST and dangerous be committed to the Department within one day of the order. 455 Md. at 528. The Department did not comply with the

51

orders because its facilities were "full." *Id.* at 535. The Supreme Court of Maryland held

that the delayed admissions did not violate CP § 3-106 because nothing in the statute "sets

a deadline for admission, or authorizes the court to set one." *Id.* at 543.

In 2018, the General Assembly amended CP § 3-106, with passage of H.B. 111 and

S.B. 233, to require that the Department admit people deemed IST and dangerous to a

Department facility within ten days after the Department receives the commitment order.

This requirement was codified in CP § 3-106(c)(2)(i). The bills amended § 3-106(c)(4) by

providing that, if the Department failed to comply, the court could impose "any sanction

reasonably designed to compel compliance."

The legislative history of the statute indicates that delays in admission to the

Department were an ongoing concern. The Floor Report for House Bill 111 notes that, in

2018, there had been a "growing concern" regarding the delivery of forensic services in

Maryland, including the failure to respond timely to commitment orders due to a lack of

available beds. *Accord* Letter from Erek L. Barron to Members of the Judiciary Committee

(Jan. 23, 2018), *in* Bill File to H.B. 111, 2018 Leg., 438th Sess. (Md. 2018) ("Going back

decades, the [Department] has refused to fix this problem and, more recently, the

[Department] has taken the position that court orders are mere suggestions—*this is an*

*affront to the rule of law*.").

The legislative history reflects that the delay in treatment was a crisis that needed to

be addressed. The Preamble to H.B. 111 states, as follows:

> WHEREAS, The unreasonable detention of defendants found incompetent
> to stand trial or not criminally responsible outside a treatment facility is a
> serious public safety risk and a violation of the U.S. Constitution; and

WHEREAS, Keeping potentially dangerous, seriously mentally ill defendants from treatment exacerbates their problems and violates their right to due process; and

WHEREAS, These individuals should promptly undergo competency restoration in a hospital designated by the Maryland Department of Health and not in a correctional facility; and

WHEREAS, The crisis of delayed treatment for seriously mentally ill and incompetent defendants in Maryland has been foreseeable for many years and well-documented, facilitated by a steady reduction in capacity and staff of State hospitals while the demand for forensic beds has remained constant; and

WHEREAS, On August 28, 2017, the Maryland Court of Appeals, in Fredia Powell, et al. v. Maryland Department of Health, et al., No. 77, September Term 2016, held that, contrary to the intent of the General Assembly, the Annotated Code of Maryland does not authorize a court to set a deadline for admission of a defendant into a hospital; and

WHEREAS, Seriously mentally ill and incompetent defendants will continue to be unlawfully housed in detention centers unless the courts have authority to impose deadlines to enforce court orders; now, therefore [the following changes to Crim. Proc. § 3-106 be enacted.].

H.B. 111, 2018 Leg., 438th Sess. (Md. 2018). *See McAlear v. McAlear*, 298 Md. 320, 343 n.24 (1984) (preamble, although not part of the statute, may be resorted to as an aid in construction). Other portions of the legislative history show the General Assembly's intent to hold the Department accountable for delays in admitting mentally ill patients to its health care facilities, despite its assertions that it lacked sufficient beds. Memo from the Senate Judicial Proceedings Committee (Feb. 7, 2018), *in* Bill File to S.B. 233, 2018 Leg., 438th Sess. (Md. 2018) ("THIS BILL WOULD HOLD THE DEPARTMENT OF HEALTH ACCOUNTABLE BY STATUTE AND TAKE RESPONSBILITY FOR PROVIDING THE NECESSARY RESOURCES AND BEDS FOR FORENSIC PATIENTS.").

The Department points to the difficulties it faces in complying with the court's orders and the many things that it has done to try to alleviate the problem. Although the record reflects that the Department has taken steps to alleviate the problem, it clearly has not been enough. In 2017 and early 2018, when the time deadline was being considered, the average wait time between a commitment order and admission was four to 12 days. Floor Report, *in* Bill File to H.B. 111, 2018 Leg., 438th Sess. (Md. 2018). In 2024, the delays for the appellees in this case ranged from 42 to 169 days after the ten-day deadline had passed. Mr. Jackson remained in the detention center for more than six months after the commitment order.

Seven years after the statute was passed, and after many court orders and court cases, the crisis of delay is only increasing. The continued failure to comply with the statutory deadline cannot continue. Under these circumstances, it was reasonable for the courts to believe that large sanctions will encourage the Department to make greater effort to explore other options to resolve this continued crisis.[26] We now turn to the individual orders in this case.

---

[26] Although the Department asserts that sanctions will "hinder the Department's ability to timely admit individuals who have been committed," "take away funding that otherwise might be available to create beds," "undermine the Department's ability to maintain standards of care," and "jeopardize federal funding that is conditioned on . . . accreditation and licensure," these are policy arguments for the legislature to address, not the courts. *See Kelly v. Marylanders for Sports Sanity, Inc.*, 310 Md. 437, 467-68 (1987) (court will not second-guess legislative priorities regarding government expenditures).

## B.

## Individual Orders

## 1.

## Mr. Boulden

With respect to Mr. Boulden, the Circuit Court for Kent County found at the April 5, 2024 hearing that the court issued an order committing Mr. Boulden to a Department facility, and the Department failed to admit Mr. Boulden within the ten-day statutory deadline. The court found that it was appropriate to impose a sanction under § 3-106(c)(4). It explained:

> The testimony that has been offered today indicates that it costs approximately $600 to $1,000 a day to keep an individual in the hospital. So that is sort of like the daily rate that is incurred by the Department for individuals to be held.
>
> The Court, therefore, . . . in an effort to comply with the requirement imposed by that section, that the Court may impose any sanction that is reasonably designed to compel compliance, the Court is going to impose a sanction of $2,000 per day starting today. The purpose of that sanction being to double the cost to the Department through their failure to comply with the statute, thereby hopefully incentivizing them to comply with the statute.

Although the Department does not challenge the holding in *Myers*, 260 Md. App. at 630, that the court was free to discredit the Department's testimony that sanctions would not compel compliance, it states that this holding does not apply here because "the court never stated that it was discrediting any testimony." In that regard, it points to the court's statement that, to find a violation of the statute, the court needed to find only that the Department failed to admit a person within the ten-day deadline, and in that context, the statute was "sort of like a strict liability standard." We note that the court was correct that

55

a violation of the statute is shown solely by evidence that the Department failed to admit a person found IST and dangerous within the statutory deadline. Whether to sanction the Department, however, is up to the judge's discretion. Here, the court exercised its discretion to impose a sanction reasonably designed to compel compliance, stating that sanctions would "hopefully incentiviz[e] [the Department] to comply with the statute."

Although the court did not specifically say that it did not believe the testimony that sanctions would not compel compliance, a court is not required to make an express determination regarding credibility. *See Marquis v. Marquis*, 175 Md. App. 734, 755 (2007) ("A judge is not required to 'set out in intimate detail each and every step in his or her thought process.'") (quoting *Kirsner v. Edelmann*, 65 Md. App. 185, 196 n.9 (1985)). The court's statement that it believed the sanctions would incentivize the Department to comply with the statute indicates that it did not credit the Department's testimony that no sanction would compel compliance. The court noted the testimony that it cost the Department $600 to $1,000 per day to care for a defendant in a Department facility, and it doubled that amount with the express purpose of "incentivizing them to comply with the statute."

The court's imposition of a sanction of $2,000 per day from the date of the hearing was not an abuse of discretion. We affirm the court's ruling.

**2.**

**Mr. Kauffman**

With respect to Mr. Kauffman, the Circuit Court for Baltimore County imposed a sanction of $195,000, representing $1,000 for each day that he was not transferred to a

56

Department facility. It stated that the length of time that Mr. Kauffman had "been languishing in a prison, as opposed to in a hospital, is, quite frankly, outrageous and a clear violation of the statute." It stated that it did not find

> any evidence of some inability on the part of the Department to comply with the statute based on the fact that they have been able to continue to admit patients and that the issues that caused them to have problems with bed space are long-standing and have not been adequately addressed. But regardless, the statute permits a sanction that is designed to encourage compliance and I believe, that -- this is sufficient to do that.

The court also found that, "if there really was a concerted effort being made, it would seem to me that [government agency procurements] may have happened a long time ago," and it did not "see anything that's changed really with respect to how the Department has been handling [this issue]."

The Department again contends that the court "did not state it was discrediting the Department's testimony," and it did not explain how the sanction would compel compliance. The court, however, expressly stated that it did not find "any evidence of some inability . . . to comply," despite Department testimony to the contrary. *See Hripunovs v. Maximova*, 263 Md. App. 244, 263 (2024) (court is entitled to reject witness testimony whether or not contradicted or corroborated by any other evidence). It explicitly found that a $1,000 per day sanction would "encourage compliance," after noting the Department's failure to address this longstanding problem. We find no merit in the Department's arguments here.

The court did not abuse its discretion in imposing sanctions. We affirm the judgment in this case.

57

**3.**

**Mr. Hawkins, Mr. Lomax, Mr. Jackson, and Mr. Goins**

At the May 8, 2024 hearing regarding Mr. Hawkins, Mr. Lomax, Mr. Jackson, and Mr. Goins, the Circuit Court for Baltimore County imposed sanctions of $1,000 per day.[27] The court specifically stated that the court did not believe the testimony that monetary sanctions would not compel compliance. The court continued:

> [T]he mere fact that efforts weren't made in 2018 to start to address the problem in itself, cries out for a sanction. Because, prior to that, the Department really never was sanctioned monetarily since cases where sanctions were imposed through a civil contempt proceeding were all reversed on [a]ppeal and the Department never had to pay it. I also believe that . . . as the numbers have increased, that a monetary sanction for each one of these cases is going to coerce compliance. I believe that it is reasonably designed, designed to compel compliance. I don't think we would need to incarcerate anyone to compel compliance. I mean, if a monetary sanction doesn't do it, what will? I do think a monetary sanction . . . will compel compliance once the Department is made to understand that they will have to pay the monetary sanction.

The Department again argues that the sanctions in these cases "cannot be upheld on the basis of deference to [the] court's credibility determinations." It notes that the court stated that it was not suggesting that anyone was "being [un]truthful in terms of their belief." That statement, however, must be viewed in context with the rest of the court's comments, particularly the statement that the court did not believe the testimony that sanctions would not compel compliance. Moreover, in imposing the sanction, the court

---

[27] Although Mr. Kauffman initially was included in this order, the court subsequently issued an order striking the sanction against him because Mr. Kauffman had filed a petition for contempt and not for statutory sanctions. Mr. Kauffman then filed a motion for sanctions, and after a July 9, 2024 hearing, the court issued the order imposing a statutory sanction, discussed, *supra*.

stated that a daily sanction based on the number of days exceeding the ten-day time limit would be more likely to compel compliance than "a flat number." There was no error or abuse of discretion in the court's finding in this regard.

The Department next contends that the sanctions relating to Mr. Hawkins and Mr. Goins were erroneous for an additional reason, i.e., they had already been admitted to a Department facility at the time the sanctions were imposed, and therefore, "there was no compliance for the court to compel." The Department argues that the phrase "reasonably designed to compel compliance" "unambiguously evidences the General Assembly's intent that the court's sanction not be punitive, but must be specifically designed to compel the Department to commit a defendant into one of its facilities."

As indicated, when assessing legislative intent, we start with the plain language of the statute. CP § 3-106(c)(4) provides that the court "may impose any sanction reasonably designed to compel compliance, including requiring the [Department] to reimburse a detention facility for expenses and costs incurred in retaining the defendant beyond the [statutory time period]." This reimbursement provision, which is only one option for a sanction, is designed to compensate county detention centers for expending their own resources to house defendants that should be in a Department facility. The statute does not contain any language stating that reimbursement or other sanctions cannot be imposed once the patient has been admitted to a Department facility. Instead, it provides that the court may impose sanctions if the Department fails to admit a defendant within the ten-day statutory deadline.

59

The Supreme Court of Maryland has explained that, when interpreting a statute, "[w]e neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute 'with forced or subtle interpretations' that limit or extend its application." *Wheeling*, 473 Md. at 376-77 (alteration in original) (quoting *Lockshin*, 412 Md. at 275). We will not "invade the function of the legislature by reading missing language into a statute." *Jordan v. Elyassi's Greenbelt Oral & Facial Surgery, P.C.*, 256 Md. App. 555, 568 (2022) (quoting *Graves v. State*, 364 Md. 329, 351 (2001)). We also must "construe the statute in a way that will advance [the statute's] purpose, not frustrate it." *Lockett v. Blue Ocean Bristol, LLC*, 446 Md. 397, 423 (2016) (alteration in original) (quoting *Neal v. Fisher*, 312 Md. 685, 693 (1988)).

Construing the statute to limit sanctions, including reimbursement to detention centers, when the Department has already admitted a defendant to a facility prior to the sanctions hearing would add words to the statute. It would frustrate the legislature's express intent to allow for reimbursement to the detention center for costs incurred in housing defendants that should be in a Department facility. It also could lead to a situation where the Department admits a defendant the day before a motions hearing to avoid sanctions, even if there has been an extensive delay in admission beyond the statutory deadline. That would frustrate the legislative intent in enacting CP § 3-106(c)(4), i.e., to hold the Department accountable for unacceptable delay in admitting defendants deemed IST and dangerous.

The Department relies on contempt cases in support of its argument that sanctions are improper where the Department has complied with the order to admit the defendant prior to the time the sanctions are ordered. It notes that, in *State v. Crawford*, 239 Md. App. 84, 120 (2018), this Court held that "a civil contempt proceeding is intended to . . . compel obedience to orders and judgments," and therefore, "a party generally may not be held in constructive civil contempt for delayed compliance with a court order if he or she has complied with the order prior to the contempt finding." *Id.* at 125 (internal quotations and citations omitted).

As we explained in *Myers*, 260 Md. App. at 627 n.36, the legislative history of CP § 3-106(c)(4) indicates that the General Assembly intended the sanctions provision to be distinct and separate from the contempt analysis under Maryland law. The initial draft of the statute included a provision allowing for a "rebuttable presumption of contempt . . . if a defendant who has been committed [to the Department] is not placed in a designated health care facility on or before the date specified by the court in a commitment order." H.B. 111, 2018 Leg., 438th Sess. (Jan. 15, 2018). It also specified that, in addition to sanctions in a contempt case, a court could also impose "any sanction reasonably designed to compel compliance." *Id.* "Although these provisions related to contempt were removed before the final legislation was enacted, it is clear that the allowable statutory sanctions were separate from contempt findings." *Myers*, 260 Md. App. at 627 n.36. The legislative history shows that sanctions under CP § 3-106(c)(4) are not tethered to the requirements of a contempt finding.

61

That Mr. Hawkins and Mr. Goins had been admitted by the time of the May 2024 hearing did not prohibit the court from imposing sanctions under CP § 3-106(c)(4). The delay in admission beyond the ten-day deadline was 51 days for Mr. Hawkins and 167 days for Mr. Goins.

The circuit court did not abuse its discretion in determining that sanctions would compel the Department to comply with the ten-day statutory deadline. We affirm the decision to impose sanctions in the cases involving Mr. Lomax, Mr. Jackson, Mr. Goins, and Mr. Hawkins.

We need to address, however, the calculation regarding the amounts in these cases. As indicated, CP § 3-106(c)(4) provides that, if the Department fails to admit a defendant within the time period specified in § 3-106(2)(i), i.e., ten business days from the commitment order, "the court may impose any sanction reasonably designed to compel compliance," including reimbursement to a detention center for costs incurred in housing a defendant beyond the ten-day period set forth in the statute. Because the Department is not in violation of § 3-106(2)(i) until it exceeds the ten-business-day deadline for admitting a defendant, we construe the statute to authorize the calculation of daily sanctions

beginning on the 11th business day after the date of the commitment order.[28] With that construction, we address the specific sanctions imposed here.[29]

### a.

### Goins

With respect to Mr. Goins, the court imposed a sanction of $182,000, calculating it from November 3, 2023, *the date of the commitment order*, to May 6, 2024, the date on which Mr. Goins was admitted to a Department facility. It stated that the delay in his admission to a Department facility was 182 days. The 11th business day after the date of the commitment order, however, was November 21, 2023. The total delay in his admission, therefore, was 167 days. Accordingly, the sanction of $182,000 was improper under § 3-106(c)(4). Although we affirm the decision to impose sanctions, we reverse the amount imposed and remand for the court to recalculate the amount of sanctions due.

### b.

### Hawkins

With respect to Mr. Hawkins, the court imposed a sanction of $67,000, calculating it from January 26, 2024, *the date of his commitment order*, to April 3, 2024, the date he was admitted to a Department facility. It stated that the delay in his admission to a

---

[28] We raised the issue of the timing of sanctions at oral argument. Counsel for the Department agreed that they should be calculated beginning on the 11th business day after the commitment order. Counsel for appellees stated that it was logical to start sanctions then, but it was not error to impose sanctions starting on an earlier date.

[29] When calculating the 11th business day from the commitment order, we do not count weekend days or holidays. Thereafter, it is appropriate to count each calendar day.

Department facility was 67 days. The 11th business day after the commitment order, however, was February 12, 2024. The total sanctionable delay in his admission was, therefore, 51 days. Accordingly, the sanction of $67,000 was improper under § 3-106(c)(4). Although we affirm the decision to impose sanctions, we reverse the amount imposed and remand for the court to recalculate the amount of sanctions due.

### c.

### Lomax

With respect to Mr. Lomax, the court imposed a sanction of $46,000, stating that Mr. Lomax's commitment order was issued on March 13, 2024, and he had yet to be admitted as of May 8, 2024, the date of the hearing. The court stated that the delay in his admission to a Department facility was eight weeks. The 11th business day after the commitment order, however, was March 28, 2024. The total sanctionable delay in his admission at that point, therefore, was 42 days. Accordingly, the sanction of $46,000 was improper under § 3-106(c)(4). Although we affirm the decision to impose sanctions, we reverse the amount imposed and remand for the court to recalculate the amount of sanctions due.

### d.

### Jackson

With respect to Mr. Jackson, the court imposed a sanction of $174,000, stating that Mr. Jackson's commitment order was issued on November 6, 2023, and he had yet to be admitted to a Department facility as of May 8, 2024. It stated that the delay in his admission to a Department facility was 174 days. The 11th business day after the commitment order,

however, was November 22, 2023. The total sanctionable delay in his admission at that point, therefore, was 169 days. Accordingly, the sanction of $174,000 was improper under § 3-106(c)(4). Although we affirm the decision to impose sanctions, we reverse the amount imposed and remand for the court to recalculate the amount of sanctions due.[30]

## Conclusion

Because this consolidated case involves multiple cases and multiple issues, we summarize our holdings and dispositions here, as follows:

1. In *Maryland Department of Health v. Jeffrey Boulden*, we affirm the judgment of the Circuit Court for Kent County imposing a statutory sanction pursuant to CR § 3-106(c)(4) in the amount of $2,000 per day beginning April 5, 2024, the date of the show cause hearing, until Mr. Boulden was placed in a Department facility.

2. In *Maryland Department of Health v. Glenn D. Hawkins*, we affirm the decision to impose sanctions pursuant to CR § 3-106(c)(4), but we reverse the final order for sanctions and remand to the Circuit Court for Baltimore County to recalculate the amount of sanctions to begin on the 11th business day after the date of Mr. Hawkins' commitment order, in accordance with this opinion.

3. In *Maryland Department of Health v. William Damond Lomax*, we affirm the decision to impose sanctions pursuant to CR § 3-106(c)(4), but we reverse the final order for sanctions and remand to the Circuit Court for Baltimore County to recalculate the amount of sanctions to begin on the 11th business day after the date of Mr. Lomax's commitment order, in accordance with this opinion.

4. In *Maryland Department of Health v. Kennard Jacobi Goins*, we affirm the decision to impose sanctions pursuant to CR § 3-106(c)(4), but we reverse the final order for sanctions and remand to the Circuit Court for Baltimore County to recalculate the amount of sanctions to begin on the 11th business day after the date of Mr. Goins' commitment order, in accordance with this opinion.

---

[30] As indicated, the court struck the initial sanctions relating to Mr. Kauffman and held a new hearing. At the July 9, 2024 hearing, the court imposed a sanction of $195,000, based on Mr. Kauffman's December 11, 2023 commitment order. At the time of the hearing, Mr. Kauffman had not yet been admitted to a Department facility. The 11th business day after the commitment order was December 27, 2023. The court calculated the sanction from that date, and therefore, we affirm the sanction of $195,000.

65

5. In *Maryland Department of Health v. Malik T. Jackson*, we affirm the decision to impose sanctions pursuant to CR § 3-106(c)(4), but we reverse the final order for sanctions and remand to the Circuit Court for Baltimore County to recalculate the amount of sanctions to begin on the 11th business day after the date of Mr. Jackson's commitment order, in accordance with this opinion.

6. In *Maryland Department of Health v. Steven R. Kauffman*, we affirm the judgment of the Circuit Court for Baltimore County imposing sanctions on the Department pursuant to CR § 3-106(c)(4).

7. In *Maryland Department of Health v. Jermell Lamar Savage, Sr.*, we reverse the order of the Circuit Court for Dorchester County finding the Department in constructive civil contempt.

**JUDGMENT OF THE CIRCUIT COURT FOR DORCHESTER COUNTY REVERSED. JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY AFFIRMED. JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE PAID BY APPELLANT.**